ESSEX COUNTY COURT OF COMMON PLEAS.

ELLEN MERRITT, PETITIONER-APPELLEE, v. AMERICAN STEVEDORES, INCORPORATED, RESPONDENT-APPELLANT.

Decided October 27, 1937.

For the respondent-appellant, *Joseph Weintraub*.

For the petitioner-appellee, *William B. McMichael*.

FLANAGAN, C. P. J.   On July 11th, 1936, at nine-thirty A. M., Leonard Merritt died as a result of sunstroke received on the previous day while working for the respondent.

The petition is filed by his mother, Ellen Merritt, a partial dependent.   The commissioner found in her favor and the appeal is by the employer, the American Stevedores, Incorporated, from his findings and award.

Leonard Merritt, a robust man of twenty-seven years, was a longshoreman, a member of a so-called "gang" of longshoremen, who were selected and gathered together by one Smith. Respondents are stevedores.   The "Smith gang" were hired by the respondents through Smith to work with other "gangs" in unloading a lumber-carrying ship called the "Sage Brush" and the "gang" worked in that connection as a unit under Smith as their foreman on the job.

The custom was (as followed in the instant case) that when longshoremen were desired by respondent to unload a

ship, word was conveyed through the labor union to as many heads of "gangs" as the circumstances required. These heads secured the men to come to the dock where they would be "checked in" by an employe of respondent and would go to work under the heads of their respective "gangs" as foremen.

July 10th, 1936, Leonard Merritt was working on the dock unloading the ship "Sage Brush." The day was an excessively hot one, the thermometer in the shade on top of the post office building at Port Newark, near where the dock was located, registered from eighty-three degrees at eight A. M., to one hundred degrees at five P. M., the temperature rising almost constantly. On the dock the temperature was ten to twenty degrees higher than on top of the post office building in the shade. The dock was a large level concrete floor open to the sun. The sky was clear, or there was so little cloudiness as not to interfere with the rays of the sun. About eleven-thirty A. M. Smith noticed Merritt slowing up, his shirt was "awful wet," he looked "awful hot," and Smith told him to go and cool off but he did not do so and continued working the rest of the working day. Merritt was working placing "Ross" blocks weighing about twenty-five pounds each for "drafts" or large piles or bundles of lumber to rest on as they would be hoisted from the hold of the ship to the cement floor of the dock preparatory to being moved away by a mechanical device known as a Ross carrier. Drafts came over at the rate of sixteen or eighteen per hour. There were two drafts which had to be repiled and it was the duty of Merritt and his working mate to accomplish this by working as best they could between the comings over of "drafts" from the ship's hold. The pieces of timber requiring to be piled were three inches by ten inches, about eighteen to twenty feet long, and weighed about one hundred and twenty-five pounds each; there were forty-two pieces in a draft.

It requires no expert to tell us that where a man works on a large flat surface of open concrete like a concrete dock he is subject to the direct rays of the sun, the reflected rays or radiated heat from the concrete, and that he breathes the hot air ascending from the surface upon which he is standing.

When Merritt had finished his day's work he went home in a car with a number of other men including his foreman, Smith. On starting for home Smith noticed that Merritt's eyes were sunken, that he remained quiet though usually jolly, and that one of the men remarked to him, "your eyes are sunk back in your head, look like dead." When Merritt reached home he went to bed, the doctor was called shortly, he came and remedies were applied. In the morning the doctor was called again and while he was present Merritt died at nine-thirty A. M. from sunstroke. In consequence of Merritt's failure to appear on July 11th, the next morning after he received the stroke, Smith procured another man to take his place. A few days later Smith acted as one of the pall bearers and was called to the home and told the cause of death.

The first objection raised on this appeal is that the deceased's injury did not arise out of his employment.

The rule applicable is stated in *Kauffeld* v. *G. F. Pfund & Sons,* 97 *N. J. L.* 335 (at *p.* 336) ; 116 *Atl. Rep.* 487, as follows: "The rule is that when the employment brings a greater exposure than that to which persons generally in that locality are exposed, injury or death resulting therefrom, such injury or death does arise out of the employment." I have no difficulty in concurring with the commissioner in his conclusion that this objection is not well taken, and that the instant case falls well within the rule quoted.

The next objection presents greater difficulty. It is that the employer had not "knowledge" of the accident within the statutory period. The observations of Merritt made by the foreman Smith on the 10th of July while he was working on the dock and while going home would require a reasonably logical individual to conclude under all the circumstances as a natural inference that Merritt had received an injury due to excessive heat while working on the dock. The failure of Merritt to show up for work on the following day (the 11th of July) would tend to confirm this conclusion in the mind of Smith. As to the ultimate outcome of that injury Smith would have no data upon which to base a conclusion.

"Knowledge" as referred to in the statute does not mean

that the person in question must be in a position to give legal testimony of his own knowledge proving the existence of the fact, nor does it mean that he must be in possession of legal evidence of the fact from other sources; it means knowledge of the kind that people in general ordinarily regard and speak of as knowledge. A man may say, "I *know* Jones has been dead for some years past," without having attended the funeral or viewed the corpse. What he means is that miscellaneous information and circumstances have engendered a belief to moral certainty in his mind that Jones is dead. I am of opinion that it is this kind of "knowledge" that the statute contemplates. Knowledge of such a kind that induces a state of mind in the reasonably well-balanced man that he consider he knows.

While Smith was not qualified to have knowledge and to testify that Merritt had received a stroke from which he was likely to die within a few hours, as a trained physician would have been under like circumstances, Smith was qualified to draw the inference that Merritt had received an injury. He had "knowledge" that Merrit had on July 10th, while working, received an injury in some degree from the excessive heat conditions to which he was exposed.

A few days after July 10th he was informed definitely that Merritt had died of sunstroke on the morning of the 11th of July but this circumstance should be disregarded as Smith was not at that time working for the respondent.

The question presented is this: Is the "knowledge" of the injured person's foreman on the job of the injury, derived from his own personal observation to be regarded as the knowledge of the employer corporation?

Counsel for respondent seems to concede that knowledge of an injured man's foreman would be imputed to an individual employer, but contends knowledge of a foreman cannot be imputed to a corporation employer. The respondent's brief says: "It would be absurd to say that where the employer is an individual, knowledge on the part of some foreman is not binding upon the part of the employer, but in the case of a corporation the result is otherwise."

The inquiry is whether or not under the Compensation act, humanely conceived for the benefit of the more or less uneducated laborer, he or his family after he is gone, should be held to a greater burden than to bring home knowledge to the person with whom he is accustomed to deal in the corporation's behalf.

It was the duty of Smith when he observed Merritt's absence on the 11th of July to report what he knew to his superiors; can the neglect of the employe now be used as a shield by his employer?

I am of opinion that that question should be answered in the negative.

Support for this view is found in *Roney* v. *Griffith Piano Co.*, 4 *N. J. Mis. R.* 31; 131 *Atl. Rep.* 686. In that case the employe, Roney, was a piano mover. One Peckham was the shipping clerk and one Penn "was in charge of the work" and was Roney's "immediate superior" which, I take it, means he was the foreman over the movers on the job. Judge Porter in his opinion says: "Penn was in charge of the work; he was a witness to the accident; saw Roney knocked down when the piano fell; saw him hold his neck and heard him complain of his neck having been hurt. This notice to Penn, whether or not he reported it to Peckham, was, it seems to me, a compliance with section 15 of the statute." Judge Porter uses the word "notice" but it is obvious from the context that it was the "knowledge" gained by Penn by observation to which he referred.

In *Hornbrook-Price Co.* v. *Stewart*, 118 *N. E. Rep.* 315, counsel contended that, under a somewhat similar statute in Indiana, "knowledge" could only be conveyed through a representative upon whom a summons could be served. The court said: "We cannot sustain counsel's contention. The knowledge of the foreman under whose direct and immediate supervision appellee worked from day to day must be regarded as the imputed knowledge of the employer."

The language of the New Jersey statute is "actual knowledge," but as a corporation can have no knowledge except in so far as the knowledge of agents is imputed to the legal

entity, the statute must contemplate actual knowledge of the agent imputed to the corporation.

In *Fear Campbell Co.* v. *Yearion,* 164 *N. E. Rep.* 282, decided in the Indiana Appellate Court, *en banc,* the foreman of the petitioning workman testified that shortly after the injury the workman showed him his leg and that "the skin looked like it was ruffled up maybe an inch and a half long down the hard bone of the leg." The court said that "this testimony discloses actual knowledge of the said injury by the appellant through its foreman Pierce. It is evident that both Pierce and appellee did not regard the injury as being of the serious nature that afterwards developed, but this fact can in no way relieve the appellant. A workman had received an injury by accident, arising out of and in the course of his employment, and his foreman had knowledge of these facts and should have reported the same to his superiors. His failure to do so cannot be charged against the appellee."

There are other cases tending to support these views: *Gibbons* v. *United Elec. Railways Co.* (*R. I.*), 138 *Atl. Rep.* 175; *Lachance's Case* (*Me.*), 118 *Id.* 370; *Simmons' Case* (*Me.*), 103 *Id.* 68; *In re Bloom* (*Mass.*), 111 *N. E. Rep.* 45; *Coline Oil Co.* v. *Winters* (*Okla.*), 8 *Pac. Rep.* (*2d*) 675; *Mumford* v. *State Highway Commission* (*N. M.*), 1 *Id.* 115; *Tennessee Coal, Iron and Railroad Co.* v. *Pope* (*Ala.*), 107 *So. Rep.* 735; *Leadbetter* v. *Industrial Accident Commission* (*Cal.*), 117 *Pac. Rep.* 449; *Western State Gas and Elec. Co.* v. *Bayside Lumber Co.* (*Cal.*), 187 *Pac. Rep.* 735.

The commissioner found that Merritt contributed $20 per week to petitioner's support and based his award on that conclusion. It seems to me that the commissioner lost sight of the fact that Merritt derived some return benefits from this contribution in the form of meals and lodging for himself. In my opinion a fairer figure would be $15 per week as Merritt's net weekly contribution. Except for this I am in accord with the findings of the commissioner.